<pre>
 1                  UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3                            --oOo--

 4  UNITED STATES OF AMERICA,    ) Case No. 23CR00219-NODJ-BAM
                                 )
 5            Plaintiff,         )
                                 ) Fresno, California
 6  vs.                          ) Wednesday, April 24, 2024
                                 ) 2:21 p.m.
 7  JIA BEI ZHU,                 )
                                 )
 8            Defendant.         )
    _____)

 9

10                   MOTION FOR BAIL REVIEW
          BEFORE THE HONORABLE ERICA P. GROSJEAN
11              UNITED STATES MAGISTRATE JUDGE

12
    APPEARANCES:
13
    For the Plaintiff:        HENRY Z. CARBAJAL, III, ESQ.
14                            ARELIS M. CLEMENTE, ESQ.
                              United States Attorney's
15                               Office
                              2500 Tulare Street, Suite 4401
16                            Fresno, California 93711
                              (559)47-4028
17
    For the Defendant:        ANTHONY P. CAPOZZI, ESQ.
18                            Law Offices of Anthony P.
                                 Capozzi
19                            1233 West Shaw Avenue
                              Suite 102
20                            Fresno, California 93711
                              (559) 221-7997
21
    Certified Court Interpreter:  Simon Wong
22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
</pre>

*Echo Reporting, Inc.*

ii

Court Recorder:                    Otilia Rosales
                                   United States District Court
                                   2500 Tulare Street
                                   6th Floor
                                   Fresno, California 93721

Transcriber:                       Crystal Thomas
                                   Echo Reporting, Inc.
                                   9711 Cactus Street, Suite B
                                   Lakeside, California 92040
                                   (858) 453-7590

1

1   FRESNO, CALIFORNIA, WEDNESDAY, APRIL 24, 2024 2:21 P.M.

2                        --oOo--

3      (Call to order of the Court.)

4           THE COURT:  Okay.  Calling United States versus --

5  it's still listed as Jia Bei Zhu, who's also known as David

6  He, 23-CR-219.  We're here for a motion for bail review.

7           Let me take appearances, starting with defense

8  counsel.

9           MR. CAPOZZI:  Your Honor, Tony Capozzi appearing

10 for Mr. He, who's present in court --

11          THE COURT:  Thank you.  Good --

12          MR. CAPOZZI:  -- with a Chinese interpreter.

13          THE COURT:  Thank you.  Good afternoon, Mr.

14 Capozzi.  Good afternoon, Mr. He.

15          And for the United States?

16          MR. CARBAJAL:  Good afternoon, your Honor.  Henry

17 Carbajal and Arelis Clemente for the United States.

18          THE COURT:  Thank you, Mr. Carbajal and Ms.

19 Clemente.

20          We're here for a motion for bail review.  I have

21 reviewed the papers as well as the transcript of the earlier

22 hearing.  I've also received a recommendation from Pretrial

23 Services.  Given Pretrial Services' recommendation, can I

24 hear from the Government?

25          MR. CARBAJAL:  Yes, your Honor.  We would strongly

2

1    disagree with Pretrial Services' recommendation.  It does

2    not address two, I think -- well, it addresses in part but

3    not comprehensively one very important thing, which is the

4    use of the different aliases.

5            Now, the Government in its submission provided

6    information on what I will term Mr. Zhu's Canadian identity,

7    identifications.  You'll note, your Honor, that the name

8    David He doesn't come back in Canada's data.  After that,

9    several years later --

10           THE COURT:  So, does he still have an operative

11   Canadian passport in Zhu?

12           MR. CARBAJAL:  I don't -- I -- I don't -- I

13   believe that's expired as of September 2023.

14           THE COURT:  Okay.  So, his Canadian passport was

15   Zhu, but it was expired?

16           MR. CARBAJAL:  I believe so.

17           THE COURT:  Okay.

18           MR. CARBAJAL:  That's the latest information that

19   we have.

20           THE COURT:  Okay.

21           MR. CARBAJAL:  And then we provided a Canadian

22   driver's license as well.  And --

23           THE COURT:  And that's also under Zhu?

24           MR. CARBAJAL:  Correct.

25           THE COURT:  Okay.

3

1          MR. CARBAJAL:  And Mr. Zhu, during the initial

2  investigation for Pretrial Services' report, provided

3  background information including his dates of residency,

4  1988 to 2014 in Canada, comes over to the United States in

5  about 2014, resides in -- around the Central Valley area and

6  various other places in the United States until he was

7  arrested.  That's what he stated to Pretrial Services.

8          And then in about 2020, he starts using the alias

9  He, He, Qiang He, and then later changed that to David He.

10  And, as Mr. Capozzi submitted in one of his exhibits, there

11  is a letter detailing an asylum application not under the

12  name Zhu but under the name He, and that's significant

13  because the name Qiang He doesn't come up in Canada's

14  database.  There's no data associated with it.  But if Jia

15  Bei Zhu was disclosed in that letter, that data would come

16  up.

17          THE COURT:  Right.

18          MR. CARBAJAL:  Okay.  So -- and I would point this

19  out as well because in Pretrial Services latest report, this

20  is used as a point of mitigation, that he applied for

21  asylum.  All your Honor has is a cover letter.  There are

22  very strict confidentiality requirements for the application

23  itself.  Mr. -- Mr. Zhu or Mr. Capozzi could have put that

24  in, but they didn't, and that's their business.  However,

25  it's -- it would be, I think, important if the Court's going

4

1  to consider that in mitigation to know what he was telling

2  -- what he was stating in his I-589, the application to --

3  for asylum, versus what he told Pretrial Services.

4      But also, even in the cover letter, it notes purported

5  persecution in China, but he told Pretrial Services in

6  November he hadn't resided in China since 1998.  And one of

7  the bases for detention back in November was obstruction of

8  justice, that Mr. He -- Mr. He, Mr. Zhu, was not honest with

9  Pretrial Services in terms of assets, family identity,

10  biographical information.  Those things haven't changed.

11  They're just, for some reason, not addressed in this latest

12  Pretrial Services report.

13      So, I'd ask the -- the Court to consider that

14  because the Government presented a lot of -- a lot of

15  information in the initial detention hearing and also in its

16  opposition for this review hearing, and it was one of the --

17  one of -- an important consideration for Judge Boone when he

18  made his findings.  So --

19      THE COURT:  Where did you find the inconsistency

20  about the Canadian residence?

21      MR. CARBAJAL:  The inconsistency being in the

22  cover letter for asylum, he there states persecution upon

23  return to China.  But in the Pretrial Services report, the

24  November 22nd, 2023 report --

25      THE COURT:  Um-hmm.

5

1          MR. CARBAJAL:  -- he said he lived his entire life
2  in China until he relocated to Canada in 1988, continued to
3  reside in Canada until 2014.  And this is page one of that
4  report, your Honor --
5          THE COURT:  Okay.
6          MR. CARBAJAL:  -- dated November 22nd of 2023.
7          THE COURT:  I see that.  Let me pull up the cover
8  letter to understand the inconsistency.  You mean because he
9  didn't point out the -- anything about Canada in the cover
10 letter?
11          MR. CARBAJAL:  No, that he -- he indicated to
12 Pretrial Services he hadn't lived in China since 1988.  So,
13 what was the persecution that he was --
14          THE COURT:  Oh, okay.
15          MR. CARBAJAL:  -- referencing in the cover letter?
16          THE COURT:  Okay.  Persecution if he returns to
17 China, but you think that was a long time ago.  Okay.
18          MR. CARBAJAL:  And -- and, again, like we're not
19 sure what the analysis would have been if he disclosed Zhu
20 and the fact that he was a Canadian citizen in that
21 application.  We don't know, and I know the Court doesn't
22 have that information in his application because it wasn't
23 submitted.
24          THE COURT:  Um-hmm.
25          MR. CARBAJAL:  Or just -- just reviewing the cover

6

1 letter compared to what information he's telling Pretrial

2 Services, there's already an inconsistency.

3       THE COURT:  But -- but I think the -- the point

4 here is that to the extent there was a question about his

5 name in the first detention hearing and Judge Boone was

6 bothered by that, this is just showing a change from Qiang

7 He to David He and --

8       MR. CARBAJAL:  Correct.

9       THE COURT:  -- still is not talking about the

10 change from Zhu and is also not describing and disclosing

11 both Zhu and his Canadian residence as far as we can tell?

12       MR. CARBAJAL:  That's correct, your Honor.

13       THE COURT:  Okay.  Do you -- what did he tell law

14 enforcement was his name?

15       MR. CARBAJAL:  David He.

16       THE COURT:  And what -- in the course of the

17 investigation, was he holding himself out to investigators

18 as David he?

19       MR. CARBAJAL:  To investigators.  But when we

20 interviewed employees of his businesses, he was identified

21 as Zhu.

22       THE COURT:  Okay.

23       MR. CARBAJAL:  Including the alias Jesse Zhu.  And

24 if you look at Exhibit 2 of our submission, your Honor,

25 there is an FDA inspection report of a Chinese-based

7

1 business disclosing the owner of that business Adai

2 (phonetic) Diagnostic, as Jia Bei Zhu.

3          THE COURT:  Um-hmm.

4          MR. CARBAJAL:  It's on pages two and four of that

5 exhibit, Exhibit 2.

6          THE COURT:  Okay.

7      (Pause.)

8          MR. CARBAJAL:  The inconsistencies across

9 identity, biographical information, business ties, all of

10 those things are still -- I think really still support Judge

11 Boone's initial finding that there's not been forthrightness

12 on the part of the Defendant.  That's not addressed in

13 Pretrial Services' Report.  It's not addressed by a bond,

14 and it's certainly not addressed by an offer of an attorney

15 that's been retained either by Zhu or these businesses that

16 are associated with him but, you know, portrayed as not

17 really associated with him --

18          THE COURT:  Right.

19          MR. CARBAJAL:  -- who can only watch him -- who

20 can only check in with him four times a week.  So, three

21 days he's not going to be watched at all, and presumably be,

22 you know, by -- by himself in that area of Las Vegas.  I

23 don't think that this -- this recommendation by Pretrial

24 Services addresses all those risk factors which were very

25 significant.

8

1     And then I would note as well Mr. Zhu not

2 disclosing the -- he doesn't have family ties in the United

3 States at all, and that's why what's being offered is an

4 attorney who has a business relationship but an undisclosed

5 personal relationship -- at least I didn't see it in the

6 Pretrial Services Report -- and who has -- who has known Mr.

7 Zhu for an unknown length of time.  That has to be the

8 proposal because all of his family is outside of the

9 country, the mother of his child, the infant son.

10     THE COURT:  They didn't come back from China?

11     MR. CARBAJAL:  They did not.

12     THE COURT:  Okay.

13     MR. CARBAJAL:  They did not.  And, in fact, the

14 declaration submitted by Mr. Capozzi was executed in China.

15     THE COURT:  Um-hmm.

16     MR. CARBAJAL:  And -- and when they spoke to Ms.

17 Wang -- when Pretrial Services spoke to her, I believe she

18 was in China, again, with no -- no return date that we're

19 aware of.

20     THE COURT:  Um-hmm.

21     MR. CARBAJAL:  And that's also very significant.

22 Now, whether her flight was booked September 3rd -- and I

23 can't tell from the screenshot.  It's very hard to see.  It

24 -- it appears to me to be September 13th, but I know it's

25 being represented as September 3rd when the -- when the

9

1  tickets were booked.  However, investigative activity was
2  already under way.  Mr. -- Mr. Zhu was already interviewed
3  by the FDA a few months before that.  And, in any event,
4  it's still of -- of huge significance.  Even if she booked
5  the tickets on September 3rd, well, the search warrant took
6  place six days before she flew out.  Now, that's kind of odd
7  that your closest family ties, including your infant, you
8  would think they would -- you know, if something that
9  serious is happening, you would think that they would stay
10 until that's addressed.  But, instead, they flew out on one-
11 way tickets.

12         We noted that Defendant still has the active
13 business interests in the Chinese company Adai and that that
14 was the company -- one of the companies used to fund the
15 purchase of the property -- one of the properties being
16 proposed for bond, and the property that he proposes to live
17 in, which right now is a rental property.  In fact, that --
18 that business, that LLC, David Destiny Discovery, owns about
19 five properties.  So, what's being offered is only a couple
20 of rental properties off of a portfolio of different
21 properties.

22         And I know there's been -- what Mr. Capozzi has
23 submitted indicates some change in ownership in David
24 Destiny Discovery.  Mr. Zhu -- that's Mr. He -- is still the
25 registered agent for that business even today.  And he --

1   what has -- what it appears to be is at the time of the

2   first detention hearing, in the lapse of a few months, steps

3   have been taken to move Mr. He -- Mr. Zhu as Mr. He, his

4   name off of these subsidiary businesses and into the name of

5   Ms. Wang who is at this point outside of the jurisdictional

6   reach of the Court.  So, I think that's also very

7   significant.

8           THE COURT:  Mr. --

9           MR. CARBAJAL:  As far as -- if I could respond to

10  a few more things that Mr. Capozzi raised, I wasn't really

11  clear on what the -- you know, there was a reference to

12  pending lawsuits being some incentive for Mr. Zhu to stay.

13  And I'm not sure.  If he's the plaintiff, he could dismiss

14  those at any time.  He can do what he wants with them.  And,

15  in any event, you know, it's sort of a dual argument that,

16  you know, Mr. He has these lawsuits and these -- this

17  interest in sticking around, but the prop -- the businesses

18  that are involved in the lawsuit somehow aren't his anymore

19  and are independent, it's -- it's really not clear.  What it

20  appears to me is that there is a -- there was an effort

21  undertaken by Mr. Zhu and his associates to, at least on

22  paper, move his name off, but he still very much retains

23  control over these items, especially when it's the mother of

24  his child that is the managing member of the LLC and has a

25  hand in the other businesses.  That's what I see is -- is

11

1  going on.

2       And then as far as -- I think I raised a couple of

3  items with the third party custodian, not living with Zhu,

4  not having a known personal close relationship.  Usually

5  when a third party custodian is picked, it's someone that

6  has a trust relationship with the defendant, a mother, a

7  sibling, someone where there is a -- a moral compulsion to,

8  you know, use best efforts to comply, and it's that trust

9  relationship that drives the appropriateness of having them

10 as a third party custodian that's typical.  It's just

11 strange that you have a -- not a friend, a business

12 associate, business relationship and that what's portrayed

13 in the Pretrial Services report is it's a business

14 relationship with the businesses, not necessarily with Mr.

15 Zhu, which then kind of -- it -- it's unclear what the --

16 you know, how -- how that's going to compel Mr. Zhu to

17 comply, why he would care if a lawyer that he can hire and

18 fire or that his wife -- you know, the companies that his --

19 his romantic partner now runs or has a hand in as a managing

20 member can hire or fire, it's unclear why he would be

21 compelled to be compliant.

22       And I would note also that there was a prior

23 attorney that was proposed in November -- in the November

24 2023 report, Mr. Thomas.  I'm not sure what happened to him.

25 He had only known Mr. Zhu for four months, and that proposal

12

1  was that he -- that Mr. Zhu live with him, and I would note

2  that that -- Pretrial -- Pretrial found that insufficient to

3  address the risk factors, and I agree.

4        Here, it's even more removed, and you have --

5  again, you have Mr. Zhu, the proposal being that, you know,

6  three days, may more, maybe even -- I don't know when Mr.

7  Len (phonetic) plans to go check on him, but he's

8  unsupervised with, you know, the use of different names an

9  aliases, and he was somehow able to obtain a passport under

10 a different name here in around 2020, 2021, and that's how

11 he was able to make his asylum application.  That's also an

12 important consideration.

13        He's going to have plenty of time to figure out

14 how to get another passport and perhaps another alias.  And,

15 so, unless the Court has other questions, I mean, that's

16 what we wanted to respond to and -- and make sure the

17 Court's aware that we do disagree with this recommendation,

18 and we feel there aren't conditions that could assure his

19 compliance and that he won't further obstruct.

20        THE COURT:  Thank you.

21        Mr. Capozzi?

22        MR. CAPOZZI:  Let me first start off with

23 penalties in this case.  He's charged with Title 18, 1001,

24 lying about his name.  He said, "My name is David He."  It

25 is.  The penalty for that -- the offense level is a level

13

1   14.  The penalty for that is 15 to 21 months.  The penalty

2   for sending out adulterated COVID kits -- that's Title 21

3   U.S.C. 331(a), the penalty, Judge, six -- zero to six

4   months.  If he's sentenced concurrently to the maximum, he's

5   going to do 27 months.  If he pled guilty, they would take

6   three points off.  He would end up doing maybe 11 months.

7   He's already done seven months.  Why would he run?

8            If I could show, he has a claim against the

9   government for what they did to him.  If I could present

10  this to your clerk.

11            THE COURT:  Thank you.

12            MR. CAPOZZI:  That's him in the hospital the day

13  he was arrested.  And in the report, the agent said, "We

14  softly pushed him down to the ground."  Softly.  Yet those

15  are the injuries he suffered.  He's filed -- he's hired

16  Kevin Little to file the claim.  He's hired Kevin Little to

17  file a civil rights lawsuit and myself to sue the government

18  for what they did to him there.

19            And when you read the statement from the

20  Government -- I think I gave you the other copy.  Let me

21  make sure.  Yeah, I did -- it points out how they approached

22  him, and when they told him to kneel down, he turned to look

23  at them as though he didn't understand.  He speaks English

24  barely, but every time I see him, I have to have an

25  interpreter.

14

1        He didn't understand what they were saying, and

2  they came, and they pushed him down to the ground, and you

3  saw the injuries he has.  He has a very viable claim.  So,

4  why would he flee when he's only got -- he's done seven

5  months?  He might have eight months more to go.  It's not

6  worth him fleeing because he is going to win on this

7  particular case.

8        UMI and PBI has claims against the City of

9  Reedley, County of Fresno for everything they destroyed, and

10  it wasn't a lab.  All the press says this was a lab down in

11  Reedley.  It was not a lab.  It was a place for a warehouse

12  to hold everything until the business in Fresno that the

13  company was developing and paid over $100,000 to have a

14  building, warehouse refurnished so they can move a lab there

15  and start the process.  They were intending on staying here.

16  He was a consultant to them, and they were going to stay

17  here because of the very profitable business.

18        I don't see how he would be a flight risk

19  whatsoever.  The -- he changed his name in China.  It was

20  Qiang He -- it's pronounced Her, not He.

21        THE COURT:  Okay.

22        MR. CAPOZZI:  He.  And when he filed for asylum,

23  he filed it under that name, and he changed his name

24  legally.  I put the document --

25        THE COURT:  Where -- I guess where did Zhu come

15

1   from that he had a Canadian passport in it?

2           MR. CAPOZZI:  Oh, he's not denying he's the same

3   person.  He changed his name.

4           THE COURT:  Well, okay.  When he --

5           MR. CAPOZZI:  When he came from Canada --

6           THE COURT:  But he didn't change it from Zhu to

7   He.  He --

8           MR. CAPOZZI:  In China he did.

9           THE COURT:  -- changed it from --

10          MR. CAPOZZI:  In China, yes.  He changed it in

11  China, to claim Her, H-E.

12          THE COURT:  There's some other document that was

13  in China that went from Zhu to He?

14          MR. CAPOZZI:  Well, try to get something from

15  China.  He can't --

16          THE COURT:  Okay.  Well, I mean, what about -- did

17  you tell Canada he has a new name?  Because that's where his

18  license and his passport are all in Zhu.

19          MR. CAPOZZI:  Right, because that was his name

20  back then.

21          THE COURT:  Well, has he told Canada, who has an

22  outstanding civil lawsuit pending, that he's not Zhu, he's

23  really --

24          MR. CAPOZZI:  They know --

25          THE COURT:  -- He?

16

1          MR. CAPOZZI:  -- where he is.  They've been

2  communicating with me.

3          THE COURT:  Okay.

4          MR. CAPOZZI:  They know where he is in the Fresno

5  County Jail under the name David He.

6          THE COURT:  Okay.

7          MR. CAPOZZI:  All right.  And, again, he changed

8  the name.  When he came here, it was Qiang Her, too Chinese.

9  He changed it from Qiang to David.

10          THE COURT:  Yeah, I just don't think the issue has

11  ever been about whether it's Qiang or David.

12          MR. CAPOZZI:  Okay.  That's fine.  All right.  But

13  the point is he has these pending lawsuits, and for him to

14  flee with so little time to do if he's convicted -- and I've

15  gone through the evidence in this case.  It is not as strong

16  a case as the Government would portray it to be.  He has

17  these injuries.  The two companies have the lawsuit -- will

18  be filing the lawsuits.  He's hired two attorneys.  He --

19  the company has hired two attorneys.  He's willing to put up

20  the two properties fully paid for.  It's over a million

21  three or more.  If he runs, he's going to lose his -- his

22  partner I guess you'd call her, the mother of his child,

23  would love all that property.  He can't go back to China.

24  He's filed for asylum.

25          THE COURT:  So, what is the deal with the

17

1  ownership of the property?  It sounded like it's actually

2  just been changed to her hands this month.

3          MR. CAPOZZI:  Well, I'd like to know that.  That's

4  not true, but I'd like to know that, where they have that

5  information.  I'd like to know.  Present some evidence

6  showing that.

7          THE COURT:  So, you don't -- you don't know?

8  Well, who owns -- who do you think owns it?

9          MR. CAPOZZI:  I know who owns it.  She does.

10          THE COURT:  When did she start owning it?

11          MR. CAPOZZI:  There's a grant deed -- hold on.

12      (Pause.)

13          MR. CAPOZZI:  I submitted to Pretrial the property

14  profiles, and for some reason we attached the Clovis

15  property to it.  I'm trying to see the recording date.  May

16  27, 2022, before all this.

17          THE COURT:  Okay.  That's when Ms. Wang took it?

18          MR. CAPOZZI:  The Clovis property in her --

19          THE COURT:  Okay.

20          MR. CAPOZZI:  Yeah, it was in her name.

21          THE COURT:  Okay.

22          MR. CAPOZZI:  But the other properties are in the

23  DDD, LLC, which is hers.  I just don't see how he's a flight

24  risk, and that's what he's being held here for.  Frankly,

25  it's because of all of the press which has been so far off

18

1  base.  He's a Chinese National, and I think there's a lot of

2  prejudice against him.  He's at the jail, and it's not easy

3  for him being there at the jail and not speaking English.

4  He can speak some English and try to understand what's going

5  on, but there's fights breaking out all the time.  There's a

6  lot of prejudice over there.  He is scared to death over

7  there.

8           Now, if he were to be released, we would propose

9  that he not work at any kind of a lab, that he would be

10 working with me, I can assure you.  He calls me 10 times a

11 day.  He'll be doing the same thing when he's in Las Vegas.

12 And I'm sure, if the Court wanted to, we'll have him call

13 his lawyer every single day or go see him every single day.

14 He'll wear an ankle bracelet.  He can't go anywhere.  A GPS

15 device would also -- would work.

16           THE COURT:  So, does he have a detainer?

17           MR. CAPOZZI:  No.

18           MR. CARBAJAL:  He does, your Honor.  It's recorded

19 in the Pretrial Services Report.

20           THE COURT:  So, he has an INS detainer?

21           MR. CARBAJAL:  That's what's recorded in the

22 Pretrial Services --

23           THE COURT:  Does that mean that he's not an -- I

24 mean, it doesn't actually legally affect my -- that he's not

25 going to be released, but if he gets released, he's going to

19

1  go to INS?

2          MR. CAPOZZI:  Well, he's filed for asylum.

3          THE COURT:  Don't know?

4          MR. CARBAJAL:  That has historically been the

5  practice, but I -- I don't know if that's --

6          THE COURT:  Okay.

7          MR. CAPOZZI:  I can --

8          MR. CARBAJAL:  Sometimes those are --

9          THE COURT:  Okay.

10         MR. CAPOZZI:  I can deal with the INS.

11         THE COURT:  Okay.

12         MR. CAPOZZI:  Those are always bondable.

13         THE COURT:  Those are always what?

14         MR. CAPOZZI:  Bondable, to put the bond --

15         THE COURT:  Bondable?

16         MR. CAPOZZI:  Yes.

17         THE COURT:  Okay.

18         MR. CAPOZZI:  Yes, the immigration bonds.

19         THE COURT:  Okay.

20         MR. CARBAJAL:  Your Honor, if I may respond to one

21  thing?

22         THE COURT:  Well, respond -- I guess, I think Mr.

23  Capozzi's main argument is that there is so little time that

24  he won't flee because of the time.

25         MR. CARBAJAL:  And let me respond to that.  The

20

1  guideline range that we expect from the misbranding is 63 to

2  78 months, with an acceptance, maybe getting down to about

3  four years.

4          THE COURT:  Okay.

5          MR. CAPOZZI:  It's not complete.

6          MR. CARBAJAL:  But I would note that if you look

7  at the <u>Townsend</u> case that we cited in our brief, your Honor,

8  when you consider the nature and circumstances of the

9  offense, the analysis is really all counts taken together as

10  if they were run consecutive.

11          THE COURT:  Okay.  Okay.  Anything further, Mr.

12  Capozzi?

13          MR. CAPOZZI:  Your Honor, the most he's going to

14  serve is 21 months in this particular case, and I don't see

15  where in the world he's a flight risk, and there are so many

16  combination of conditions that can preserve him to be

17  present in court.  He wants to be present in court.  He

18  wants to get to trial.  My problem is I'm tied up in trial

19  for months, and that's unfair to him.

20          Submitted, Judge.

21          THE COURT:  Okay.  I'm going to deny the motion

22  for bail review.  I want a -- a little preference to

23  remember that this is not just me looking at all the things

24  and making a different decision than Judge Boone.  What I

25  have to do is look at Judge Boone's decision and then see if

1  the new information, new material information would change

2  that.  So, I did review closely the initial detention

3  decision of -- of Judge Boone, and he did find that

4  detention made sense.

5          First, the nature and circumstances of the

6  offense, although Mr. Capozzi has issues with that, I don't

7  think that has changed the motion for bail review.  Also,

8  there -- there are no community ties.  That continues to be

9  the case.  In fact, his -- the -- the newborn and the -- his

10 -- the mother of, that did flee and have -- have not come

11 back.

12          MR. CAPOZZI:  Can I --

13          THE COURT:  So, there are no -- so, there are no

14 ties.  No.  You can say something in the record if you want

15 after that.

16          MR. CAPOZZI:  Okay.

17          THE COURT:  I do agree when he said insufficient

18 financial resources, at least now, that there is a bond.

19 And then he also brought up the different name.  In fact, he

20 said that was the largest concern.  Again, even though I saw

21 the change from Qiang to David, I still did not see -- and I

22 -- there was -- I was almost expecting to see that there had

23 been some legal change from Zhu to Her.  There -- there had

24 not.  So, I think Judge Boone's largest concern that he was

25 actually operating in a legal capacity under two names

22

1  continues to be -- continues to be the case.

2        That -- I also note, as was in the initial report,

3  that he fled a civil lawsuit in Canada and moved his

4  business here.  He has used many different company names, as

5  well as aliases.  ICE could identify -- could not identify

6  the Defendant based on the information that was given that

7  suggests that there were different names that were not

8  connected, at least according to ICE.

9        He's had an unstable residence since the time he

10  has moved from Canada in 2014.  He's been in Seattle, Las

11  Vegas, Tulare, and Los Angeles.  Again, he has no family to

12  stay with if he stays here.

13        I still am bothered with the -- what I think is

14  just a misstatement that he said he had no children, and he

15  does have a child.  I did not find the reference to the

16  declaration of Ms. Wang that said they have an agreement not

17  to tell anyone about children persuasive at all.  I don't

18  understand what that's for, but that is not an excuse not to

19  tell a law enforcement individual about your children when

20  you're asked about your children.

21        He also -- it did not change the fact that he told

22  Pretrial Services that he only had 10 to 20 thousand dollars

23  in assets.  This was also discussed at the hearing with

24  Judge Boone.  It appeared he had at least access to very

25  significant assets but did not disclose any of that to

23

1  Pretrial Services.

2          He also -- at least it is alleged that he refused

3  to comply with the arrest.  I agree with Mr. Carbajal that I

4  don't think the fact that he has a lawsuit makes it more or

5  less likely that he would stay in or ameliorate the risk of

6  flight.  He does have a Chinese passport.  He is a Chinese

7  citizen.  He has family in China, including his newborn and

8  the mother of his newborn.

9          So, against that, I did look that there was a

10 third party custodian that gives some weight, but it is

11 unusual.  They don't have a personal relationship.  They

12 have a business relationship.  If there are financial

13 consequences, it may hurt the third party custodian as well.

14 So, I -- I weighed that, but I didn't think that that was

15 enough.

16         The bond package is quite large.  And, so, that

17 was really -- if that could be ameliorated -- but I don't

18 think so.  They are rental properties.  It appears that it's

19 only one part of this business property, and I did not think

20 that that alone was enough to change Judge Boone's decision

21 that there are no condition or combination of conditions

22 that will assure his appearance and also satisfy the concern

23 about obstruction of justice.  In fact, these -- hearing

24 that there are different owners and that that is changing

25 just elevates that concern.

24

1           Okay.  What did you want to say?

2           MR. CAPOZZI:  Just a couple of points.  There was

3  no evidence that his personal assets were more than $20,000.

4  he might have access to the money through his girlfriend,

5  the mother of his child, but his assets were $20,000 in the

6  bank is what he said.

7           His -- the mother of his child didn't flee the

8  country.  She made a reservation --

9           THE COURT:  I mean, it was about for posting of a

10 bond, though, because it's -- the Defendant estimated he had

11 10 to 20 thousand dollars cash available for posting of a

12 bond.  He reported no other assets.

13          MR. CAPOZZI:  Right.

14          THE COURT:  And now he says that he does have

15 access to very substantial assets --

16          MR. CAPOZZI:  But not his assets.

17          THE COURT:  -- and he is at least -- he has some

18 role in that organization.  What is the role in this -- in

19 that organization?

20          MR. CAPOZZI:  He's got his -- the mother of his

21 child has possession and control.

22          THE COURT:  I also heard he takes the actual

23 checks, that he got checks from rentals and that he --

24          MR. CAPOZZI:  Yeah, that he put --

25          THE COURT:  -- was the person who deposited the

25

1   checks.

2           MR. CAPOZZI:  Right.

3           THE COURT:  So, he has an ability to deposit money

4   in that account?

5           MR. CAPOZZI:  Right.

6           THE COURT:  He has access to the bank account?

7           MR. CAPOZZI:  Yes.  He can write checks on that,

8   yes.

9           THE COURT:  That would be enough to tell Pretrial

10  Services that there was access to assets.  They're these

11  same --

12          MR. CAPOZZI:  They're not his --

13          THE COURT:  -- assets you're putting up right now.

14          MR. CAPOZZI:  I'm not going to argue with you.

15  Okay.  And rental properties, one was a rental.  The other

16  is where he lived, along with his wife -- or his -- the

17  mother of his child.

18          THE COURT:  Okay.

19          MR. CAPOZZI:  That's it.

20          THE COURT:  Okay.  Thank you very much.

21          MR. CARBAJAL:  Thank you, Judge.

22          MR. CAPOZZI:  Thank you, Judge.

23          THE COURT:  Wait.  Let's make sure we have -- do

24  we need anything else?  We need -- no.  We have a status

25  conference set.  So, stat -- your next status conference is

26

1  May 22nd, 2024 at 1:00 p.m. before Judge McAuliffe.

2          MR. CAPOZZI:  Yeah.

3          MR. CARBAJAL:  Thank you, Judge.

4          THE COURT:  Thank you.

5          MR. CAPOZZI:  Thank you.

6      (Proceedings concluded.)

27

1           I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Crystal Thomas            5/4/2024

Transcriber, AAERT CERT *654    Date

6

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7

8

/s/L.L. Francisco

9 L.L. Francisco, President

Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25